UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JOHN S. GAUL,                        )
                                     )
            Plaintiff                )
                                     )
      v.                             )   CIVIL NO. 2:10 cv 20
                                     )
CITY OF HAMMOND, INDIANA, a          )
Political Subdivision of the         )
State of Indiana; JOHN DOE,          )
Individually and in his capacity)
as City of Hammond Police            )
Officer; RICHARD ROE,                )
Individually and in his capacity)
as City of Hammond Police            )
Officer,                             )
                                     )
            Defendants               )

OPINION AND ORDER

This matter is before the court on the Motion for Summary
Judgment [DE 21] filed by the defendants, City of Hammond,
Indiana, John Doe and Richard Roe, on August 12, 2011.  For the
reasons set forth below, the motion is **GRANTED.**

Background

On January 14, 2008, Hammond Police Officer Thomas Andrews
received a dispatch to respond to a complaint about an intoxi-
cated man leaving Billy Bear's Bar and Grill.  Upon arrival,
Andrews observed an intoxicated man behind the steering wheel of
a Volkswagen Passat.  The intoxicated man identified himself as
John Gaul, the plaintiff in this matter.  Gaul, who was 59 years
old at the time, appeared to have dull reactions, slow and clumsy

dexterity, unsteady balance, and his speech showed that he was confused, thick-tongued, mumbling, and slurring.  Based upon his observations and training as a police officer, Andrews arrested and charged Gaul with public intoxication and transported him to the Hammond City Jail for processing.

Andrews arrived at the jail with Gaul at approximately 9:45 p.m., at which time Gaul was booked into the jail.  Gaul later stated that he had one or two pitchers of beer at the bar and that he believed someone spiked his drink that night.  Gaul could not remember why he was arrested, his transport to Hammond City Jail, or the booking process.

As part of the booking process, Andrews asked Gaul a series of medical questions.  Gaul answered each question, and Andrews registered his responses into the Hammond Police Department computer.  Corporal Phillip Merritt assisted Andrews throughout the process of booking Gaul into the Hammond City Jail.  During the booking process, Gaul was compliant, not combative, and did not pose any problems.  After the booking process was complete, Gaul was detailed in cell number 5 where he was the sole occupant.

When assigning detainees to cells in the Hammond City Jail, it was standard procedure to fill particular cells with multiple inmates unless it was known that a particular inmate had some

2

sort of medical or other problem or seemed combative or problem-
atic.  Gaul did not present any medical issues, and during his
arrest and booking, the officers did not see any combative or
hostile indicators or other issues that would  require that Gaul
be placed in a cell by himself.

Alvino Amaya was arrested for public intoxication and
possession of marijuana the same night and booked at the Hammond
City Jail around midnight.  The officers reported that Amaya was
compliant throughout the booking process, he was not combative,
and he did not pose any problems for jail staff.  At the time of
his arrest, Amaya was 23 years old.  He described himself as very
angry before arriving at the Hammond City Jail.  Amaya was on
probation at the time of his arrest because of a family fight and
had been going to anger management classes for a year.  After his
booking was complete, at approximately 12:30 a.m., Amaya was
placed in cell 5 with Gaul.  Amaya proceeded to pace around the
cell.

Corporal Sean Garrison and Sergeant John Peck were on duty
with Merritt in the Hammond City Jail throughout the evening
hours of January 14 and the early morning hours of January 15,
2008.  The officers were not assigned to a particular area of the
jail, although one officer typically would occupy each of two
booking stations while the other occupied a control station that

operated the Hammond City Jail's doors, camera, and intercom system.  During the January 14, 2008 shift, Garrison generally stationed himself at booking station 2, Merritt at booking station 1, and Peck was at the control station.  However, the officers were subject to some rotation to accommodate matters at the jail.  It would not be unusual for one station to be left unoccupied for a period of time during a shift while the officer attended to another problem.

The Hammond City Jail was equipped with an intercom to allow officers to communicate with inmates in their cells and a video monitoring system.  When an inmate wished to communicate with an officer, he could press a button on the intercom and a green light would flash in the control area, alerting the officer of the inmate's call.  The officer then could activate the intercom in a particular cell and communicate.  All of the officers were trained to use the intercom system.  Peck recalled speaking with Amaya over the intercom a few times over the course of the night regarding Amaya's wish to make telephone calls.  Peck did not speak to Gaul over the intercom system.

Each cell had its own video camera that was capable of capturing a fixed part of the cell.  The cameras were partially blacked out to avoid taping the area of the cell where the toilet, sink, and intercom were located.  This was common in jails and was done to protect inmates from an officer of the

4

opposite sex reviewing the tape of an inmate using the toilet. The images from the cameras were fed to the jail's control area where they could be observed by the on duty officer. The techno-logical limitations of the camera system were such that the on-duty officer only was able to observe footage within the respec-tive cells in a live fashion and without the benefit of an instant replay. It was not possible or expected that the offi-cers would observe every event in every cell through the cameras. Video reports recorded any time the on-duty officer viewed what was occurring in the cells through the camera system. On the night in question, the officers used the cameras 31 times to monitor the cells, eight of those times occurred while Gaul and Amaya were housed together.

Another detainee told Garrison that he heard a commotion coming from one of the cells. Garrison told Merritt to check the camera monitors for any disturbances. Merritt reported to Garrison that he checked the camera monitors and everything appeared fine. The officers did not conduct a visual check on the prisoners. Peck did not hear any commotion coming from the cell where Gaul and Amaya were detained, nor does he recall observing any physical contact when he checked the camera moni-tors. Peck also stated that he did not observe any blood through the video monitor in cell number 5. Merritt recalled checking

5

the camera video monitors throughout his shift but never observed anything out of the ordinary.

Between 2:30 a.m. and 2:45 a.m., a cash bond was posted on Gaul's behalf.  At the time Gaul was released from the cell, Merritt noticed blood on Gaul's face, swelling of his forehead, and blood running down Gaul's nose and mouth.  Merritt called the Hammond Fire Department to render medical attention.  Gaul informed Merritt that Amaya had kicked and punched him while he was sleeping on the bottom bunk in his cell.  Merritt asked Gaul if he had tried to use the jail intercom button but reported that he did not receive a coherent answer.  Gaul was treated on the scene and then transported to St. Margaret's emergency room by ambulance.

The Hammond Police Department began an internal investigation of the assault.  The investigation was supervised by Assistant Chief John Doughty, who assigned several investigating officers.  An evidence technician first was called to the scene.  Photographs were taken of cell 5, which showed that the toilet, sink, mirror, wall, and intercom had blood on them.  These areas were out of view to the camera in the cell.  The only blood that was observable by the camera was on the floor near the lower bench where Gaul had been sitting.

The investigators took statements from the on-duty jail personnel at the time of the incident, Gaul, and Amaya.  Gaul

6

made his first statement at approximately 12:55 p.m. on January 15, 2008. He stated that he had been arrested, but could not remember why. He did not remember being transported to the jail or the booking process, but he did recall another individual being placed in the cell and hearing his own name over the intercom, at which time he was released. The police officers then called an ambulance, and he was transported to the emergency room. He could not remember what the other person in the cell looked like or being struck, but he could remember that his nose was bleeding. Two days later, Gaul made another statement to the investigators. He stated that he did not know what happened to cause his injuries. He woke up, was bleeding, but did not remember anything other than being released, seeing a friend, and having medical assistance rendered.

Amaya also made a statement on the night of the incident and admitted to assaulting Gaul. The investigation resulted in criminal charges being filed against Amaya for felony battery of Gaul.

Gaul's assault was captured by the video recording and reveals that Amaya kicked Gaul and punched him in the face, knocking him backwards and to the floor. Amaya later punched Gaul in the face two more times. The occurrences were brief in duration and occurred approximately ten minutes apart. The officers only viewed the video feed twice between the time the

7

battery occurred and Gaul was released on bond, once for a total
of 16 seconds and the other for 2 seconds.  During the officers'
first viewing, the recording showed Gaul standing and Amaya
behind the black masked out portion of the camera.  Gaul walked
toward the intercom and Amaya advanced toward Gaul, causing Gaul
to jump back.

Other portions of the video that the officers did not view
that night revealed blood on Gaul and Amaya menacing Gaul.  At
one point, Gaul attempted to call for help on the intercom, but
Amaya punched him on the right side of the face.  Gaul tried to
push a button on the door, but Amaya appeared to be guarding the
intercom.  Later, Gaul could be seen pushing the intercom button,
but he never received a response.  Peck did not recall speaking
with Gaul over the intercom, and Merritt did not recall anyone
calling through the intercom.  The internal investigators deter-
mined that the on-duty jail officers would have needed to view
the video feed at the moment of the assaults to see the attacks
because it would have been difficult for the officers to see any
injury to Gaul given his positioning on the bunk.

Following the assault, Gaul filed his complaint with this
court alleging that the City of Hammond and its agents violated
his constitutional rights by failing to protect him from Amaya,
failing to intervene to protect him, denying him medical atten-
tion, failing to train and supervise its officers and employees,

8

and falsely arresting and unlawfully detaining him.  Gaul also added several state law claims, contending that he was falsely imprisoned, the city never evaluated him for non-alcoholic symptoms that may have contributed to an appearance of intoxication, respondeat superior, and indemnification. The defendants now move for summary judgment on all claims.

Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Kidwell v. Eisenhauer,* 679 F.3d 957, 964 (7th Cir. 2012); *Stephens v. Erickson,* 569 F.3d 779, 786 (7th Cir. 2009).  The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Stephens*, 569 F.3d at 786.  A fact is material if it is outcome determinative under applicable law.  There must be evidence on which the jury could reasonably find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Stephens*, 569 F.3d at 786; *Wheeler v. Lawson*,

9

539 F.3d 629, 634 (7th Cir. 2008). However, summary judgment may be entered against the non-moving party if it is unable to "establish the existence of an essential element to [the party's case, and on which [that party] will bear the burden of proof at trial . . . ." *Kidwell*, 679 F.3d at 964 (*citing Benuzzi v. Bd. of Educ.*, 647 F.3d 652, 662 (7th Cir. 2011) (*quoting Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2548)).

Summary judgment is inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles. *Ashman v. Barrows,* 438 F.3d 781, 784 (7th Cir. 2006). Upon review, the court does not evaluate the weight of the evidence, judge the credibility of witnesses, or determine the ultimate truth of the matter; rather, the court will determine whether there exists a genuine issue of triable fact. *Wheeler*, 539 F.3d at 634 (*citing Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold in-
> quiry of determining whether there is the
> need for a trial--whether, in other words,
> there are any genuine factual issues that
> properly can be resolved only by a finder of
> fact because they may reasonably be resolved
> in favor of either party.

10

> [T]his standard mirrors the standard for a
> directed verdict under Federal Rule of Civil
> Procedure 50(a), which is that the trial
> judge must direct a verdict if, under the
> governing law, there can be but one reason-
> able conclusion as to the verdict.

*Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511

*See also* ***Reeves v. Sanderson Plumbing Prods., Inc.***, 530 U.S. 133,
149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-122 (2000)
(setting out the standard for a directed verdict); ***Celotex Corp.***,
477 U.S. at 322-23, 106 S.Ct. at 2553; ***Stephens,*** 569 F.3d at 786;
***Argyropoulos v. City of Alton***, 539 F.3d 724, 732 (7th Cir. 2008)
(stating that a genuine issue is one on which a reasonable fact
finder could find for the nonmoving party); ***Springer v. Durfling-***
***er,*** 518 F.3d 479, 483 (7th Cir. 2008)(stating that a genuine
issue exists and summary judgment is inappropriate if there is
sufficient evidence for a jury to return a verdict for the
nonmoving party).

Title 42 U.S.C. §1983 provides a "federal cause of action
for the deprivation, under color of [state] law, of a citizen's
rights, privileges, or immunities secured by the Constitution and
laws of the United States . . . ." ***Livadas v. Bradshaw***, 512 U.S.
107, 132, 114 S.Ct. 2068, 2082, 129 L.Ed.2d 93 (1994). Section
1983 does not itself create substantive rights, but "it acts as
an instrument for vindicating federal rights conferred else-
where." ***Spiegel v. Rabinovitz***, 121 F.3d 251, 254 (7th Cir. 1997).

11

When analyzing a §1983 claim, it is necessary to identify the specific constitutional right that was violated. *Spiegel*, 121 F.3d at 254. Then, the validity of the claim must be judged by reference to the specific constitutional standard that governs the right. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989).

Gaul first alleges that the City of Hammond and its agents violated his constitutional rights by failing to protect him from Amaya. Section 1983 claims raised by a pre-trial inmate are analyzed under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment Cruel and Unusual Punishment Clause. *Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007). However, the protections under the Due Process Clause are at least as extensive as those under the Eighth Amendment. *Guzman*, 495 F.3d at 856 (*citing City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2970, 2983, 77 L.Ed.2d 605 (1983)). "Prison officials owe inmates, both those who have been convicted and those being detained while awaiting trial, a duty to protect them from violence inflicted by other inmates." *Guzman*, 495 F.3d at 856-57 (*citing Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)). This protection extends only to "objectively serious injuries" that are a result of the "deliberate indifference" of the officers. *Guzman*, 495 F.3d at 857.

To prevail on the issue of deliberate indifference, the plaintiff must show that the officers were "aware of a substantial risk of serious injury to [the inmate] but nevertheless failed to take appropriate steps to protect him from the known danger." *Guzman*, 495 F.3d at 857.  The officers must have had knowledge of the specific, impending, and substantial threat, or the risk.  *Bonner v. Ticer*, 2012 WL 6115718, *1 (S.D. Ill. Dec. 10, 2012)(*citing* *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996)). *See also*, *Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006). "Prison officials who had actual awareness of a substantial risk to the health or safety of an inmate incur no liability if they 'responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent.'"  *Guzman,* 495 F.3d at 857 (*citing* *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002)).

Whether an officer acted with deliberate indifference depends on the information available to the officer at the time that the decision forming the basis of the lawsuit was made. *O'Brien v. Indiana Dept. Of Correction ex. rel. Turner*, 495 F.3d 505, 510 (7th Cir. 2007).  "Proving that an officer was deliberately indifferent to the safety of a detainee requires 'more than a showing of negligent or even grossly negligent behavior.'" *Guzman,* 495 F.3d at 857(*citing* *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005)).  The officer's actions must have been the

13

equivalent of criminal recklessness.  *Guzman*, 495 F.3d at 857.
*See also* *Slade v. Bd. of School Directors of City of Milwaukee*,
2012 WL 6701869, *2 (7th Cir. 2012) (questioning whether the
civil definition of reckless is applicable and abolishing the
requirement that the state actor have actual knowledge if the
risk was obvious).  The "deliberate indifference" standard is met
only where there was a strong likelihood, rather than a mere
possibility, that serious harm would occur.  *State Bank of St.
Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983).  In short,
to prevail the plaintiff "must demonstrate that he 'was at
serious risk of being harmed [and the on-duty officers] decided
not to do anything to prevent that harm from occurring even
though [they] could have easily done so.'" *Pinkston*, 440 F.3d at
889 (*citing* *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005)).

The Seventh Circuit has been reluctant to find that the
officer had specific knowledge of the threat, and knowledge of a
general harm is not sufficient to put the officer on alert.
*O'Brien*, 495 F.3d at 509.  In *Butera v. Cottey*, 285 F.3d 601, 606
(7th Cir. 2002), the inmate reported to the officers that he was
"having problems in the block" and "need[ed] to be removed".  The
court found this report not specific enough to put the officers
on notice that another inmate was a specific danger to the
plaintiff.  *Butera*, 285 F.3d at 606.  In *Washington v. LaPorte
County Sheriff's Dept.*, 306 F.3d 515, 518 (7th Cir. 2002), al-

14

though the court acknowledged that the prison's system of allow-
ing inmates to choose their bunks may not have been reasonable,
because the guards had no reason to expect the particular attack
by the plaintiff's cell mate, the court determined that the
officers did not act with deliberate indifference.  The court
explained that the key inquiry was whether the officers had
actual knowledge of the risk. *Washington*, 306 F.3d at 518.

Although the court generally requires evidence of actual
knowledge, "[u]nder some circumstances, a risk might be so
obvious that actual knowledge on the part of prison officials may
be inferred." *See* *Farmer*, 511 U.S. at 842, 114 S.Ct. at 1981.
*See also* *Slade,* 2012 WL 6701869 at *2 ("[I]t's an unsettled
question whether knowledge of the risk is required or it is
enough that the risk is obvious."); *Estate of Cole by Pardue v.
Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)("[A]ctual knowledge of a
substantial risk of serious harm can be inferred by the trier of
fact from the obviousness of the risk . . . .")(*citing* *Haley v.
Gross*, 86 F.3d 630, 641 (7th Cir. 1996)).  "Examples of 'obvious'
risks involving inmate violence include when a 'substantial' risk
of inmate attacks was longstanding, pervasive, well-documented,
or expressly noted by prison officials in the past." *Washington,*
306 F.3d at 519.

Gaul argues that the officers acted with deliberate indif-
ference when they placed Amaya in his cell because they should

15

have been aware that he was angry and prone to act violently. Amaya was younger than Gaul by 26 years and in good shape.  Gaul described himself as stressed and angry and paced around the cell.  At the time of his arrest, Amaya was on probation because of a family fight and had been attending anger management classes since the previous year.  Another inmate also told Garrison that he heard a commotion coming from one of the cells.  Gaul argues that together, these events should have put a reasonable person on notice that Amaya was dangerous and posed a threat to Gaul's safety.

Whether a "reasonable person" may have inferred that Amaya posed a threat to the safety of others is not the standard by which the officers' actions must be judged.  Rather, the court must evaluate whether the officers had knowledge of the specific threat and acted with a deliberate indifference.  The record does not suggest that the officers either had actual knowledge that Amaya was a danger or that the risk was so obvious that actual knowledge should be inferred.  Although an inmate informed one of the on-duty officers that he heard a commotion in one of the cells, this was not specific enough to alert the officers that Amaya battered Gaul.  Under *Butera,* even a report by the plain-tiff that he was having problems was not sufficient to put the officers on specific notice.  *Butera*, 285 F.3d at 606.  Here, the

16

report did not come from Gaul, nor did the report identify where, from whom, or what the commotion concerned.

Although Gaul has pointed to Amaya's history of anger problems, this again appears too attenuated to place the officers on notice that Amaya would attack Gaul. Amaya had one prior incident involving abuse that was directed toward a family member. He did not have an extensive history of committing battery, nor any history of harming strangers or acting violently when drunk. More convincingly, the record reveals that the officers did not have knowledge of Amaya's propensity for violence at the time he was assigned to cell 5, and Amaya was cooperative during the booking process and did not appear aggressive. Gaul has presented no evidence to contradict this or to show that the officers should have known that Amaya's behavior would turn aggressive after the booking process was complete.

Gaul also draws attention to the difference in age and fitness level of the cell mates, criticizes the jail for placing two drunk individuals together in a cell, and complains that the cameras should not have been partially blacked out. However, this argument is similar to that made by the plaintiff in *O'Brien* who argued that the policy of placing former corrective officers in an area with other "at risk" inmates was a deliberate indifference to the inmate's safety. *O'Brien*, 495 F.3d at 510. The court rejected this argument and explained that "[t]he prison had

17

been placing people like him in exactly these circumstances long
before he arrived on the scene and there is nothing in the record
to indicate that any member of the prison staff had a reason to
think it would not continue to provide relative safety for those
inmates." *O'Brien*, 495 F.3d at 509.  To be actionable, the
policies must have resulted in a specific threat to the inmate's
safety rather than pose a general threat*. See O'Brien*, 495 F.3d
at 509 (explaining that the general threat to safety caused by a
jail's policy was not specific enough to make the officers aware
of a threat to the inmate).

The Hammond City Jail had a long-standing policy of placing
multiple inmates in a single cell absent some indication that an
inmate had a problem that required separation or was combative.
Although the long-standing practices may have resulted in a
general threat to the safety of all inmates because they were
exposed to other inmates and the officers could not view all of
the activity inside the cell, nothing of record suggests that it
posed a specific threat to Gaul or that the prison staff had
reason to think they could not provide adequate safety.  Gaul has
presented no evidence that these practices routinely were prob-
lematic, nor has Gaul provided any evidence to show that the
officers deviated from the policy and placed an inmate who
displayed aggressive behavior in his cell.  The evidence is
uncontradicted that Amaya did not display aggressive behavior

18

during his arrest and booking.  Absent evidence that the policy generally was not effective or that the officers had actual knowledge of Amaya's propensity for violence, the record is clear that the officers were without knowledge of more than a general risk to Gaul's safety.  Because of the officers' lack of knowledge of a specific threat to Gaul, their decision, although judged by hindsight may not have been the ideal course of action, did not rise to the level of deliberate indifference.  The "mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Guzman*, 495 F.3d at 857 (*citing Peate*, 294 F.3d at 882).

Moreover, assuming that the officers later learned of an actual, specific threat of violence or battery from the other inmate's report, Gaul has not established that the officers responded with deliberate indifference for his safety. If the officers had done nothing, a question of material fact arguably may remain.  However, the officers reacted to the information. *See O'Brien*, 495 F.3d at 510.  After receiving the report from another inmate who heard commotion, Garrison directed Merritt to check the video camera.  Merritt reported that he did so and that he did not observe anything unusual.  The uncontradicted evidence shows that during the times the officers checked the live feed, there was neither suspicious activity nor could the officers see Gaul's injuries given his positioning on the bed. None of the

19

officers was watching the camera during the few seconds any of the occurrences took place.  The failure to inspect the record- ings more thoroughly might be characterized as negligence, but it falls short of the deliberate indifference standard.  *See Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (explaining that failure to review the logbooks would be negligence).

Gaul contends that the appropriate response would have been to check the cells, but "[e]xercising poor judgment . . . falls short of meeting the standard of consciously disregarding a known risk to his safety."  *O'Brien*, 495 F.3d at 510.  The officers did not encourage, condone, ignore, or fail to respond to an obvious or observed problem.  They investigated and did not see anything out of the ordinary.  Their failure to perform a personal search of the cells was at most negligent.  For this reason, the defendants' motion for summary judgment on Gaul's failure to protect claim is **GRANTED.**

In Count II, Gaul complains that the on-duty officers violated his constitutional rights by failing to intervene.  A claim for failure to intervene typically arises when an officer is present and fails to prevent another officer from infringing on the constitutional rights of a citizen if the officer "had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement

20

official; and the officer had a realistic opportunity to inter-
vene to prevent the harm from occurring." ***Abdullahi v. City of
Madison***, 423 F.3d 763, 774 (7th Cir. 2005). *See also **Lanigan v.
Village of East Hazel Crest, Ill.***, 110 F.3d 467, 477 (7th Cir.
1997). The officer must have had a realistic opportunity to
intervene. This has been implied where the officer could have
"called for a backup, called for help, or at least cautioned [the
excessive force defendant] to stop." ***Abdullahi***, 423 F.3d at 774.
This generally is an issue for the jury to decide unless no
reasonable jury possibly could conclude otherwise. ***Abdullahi***,
423 F.3d at 774; ***Lanigan***, 110 F.3d at 477.

It is not clear whether Gaul is asserting that the officers
failed to intervene to stop Amaya from assaulting him or that one
officer failed to stop another officer who was not adequately
protecting him. If he is alleging the first, Gaul's claim falls
outside the scope of the traditional failure to intervene claim
because the battery was not conducted by an officer. *See
**Abdullahi***, 423 F.3d at 774. The attack by Amaya was not commit-
ted by a state actor or done under the color of the state and was
not a constitutional violation. *See **Adickes***, 398 U.S. at 151, 90
S.Ct. at 1604 (explaining to prevail on a claim under §1983, the
plaintiff must show that the defendant acted under color of state
law). Additionally, even assuming that the identity of the
attacker is irrelevant, as explained above, Gaul has not pointed

21

to evidence to show that the officers had a realistic opportunity to intervene or to prevent the harm from occurring.  None of the officers was aware that the battery occurred prior to Gaul's release and could not have intervened to stop the fight.

Similarly, as explained above, Gaul has failed to show that an officer violated his constitutional rights by failing to protect him.  None of the officers had knowledge of a specific threat or acted with deliberate indifference, and even if one of the officer's actions did rise to the standard of deliberate indifference, Gaul has presented nothing to show that another officer was aware of the constitutional deprivation and could have intervened.  Absent evidence of both a constitutional violation and knowledge of such violation on behalf of a state actor, the court finds Gaul's claim baseless and **GRANTS** summary judgment in favor of the defendants.

Gaul next advances a claim for denial of medical attention. Whether the prison officials violated the Fourteenth Amendment by failing to provide medical attention is judged under the deliber- ate indifference standard.  ***Castellano v. Chicago P.D.***, 129 F.Supp.2d 1184, 1189 (N.D. Ill. 2001).  "In order to determine deliberate indifference, the court must examine a two-part test: (1) an objective component which examines whether the medical condition was serious, and (2) a subjective component which examines whether the defendants were deliberately indifferent to

that serious medical need." *Castellano*, 129 F.Supp.2d at 1189
(*citing* ***Sherrod v. Lingle***, 223 F.3d 605, 610 (7th Cir. 2000)).
The defendants concede that Gaul's injuries were serious but
dispute whether the officers were deliberately indifferent to his
medical needs.  "Proof of deliberate indifference may be found
where a prison official 'intentionally denies or delays access to
medical care or intentionally interferes with the treatment once
prescribed.'"  The officers must have knowledge of the need for
medical care.  *Castellano*, 129 F.Supp.2d at 1190.  Allegations
that an officer mocked or responded sarcastically to a plea for
medical attention are sufficient to create a question of material
fact concerning knowledge and intentional disregard for the need.
*Castellano*, 129 F.Supp.2d at 1190.

    The record is devoid of any evidence that any of the offi-
cers were aware of Gaul's need for medical attention at any time
prior to his release.  Although Gaul argues that the officers did
not adequately monitor the activity in his cell, this is irrele-
vant to whether the officers did in fact have knowledge that he
was injured.  The uncontradicted evidence shows that the officers
did not observe the punches and could not have seen the blood in
the cell through the video monitoring system.  Given Gaul's
positioning on the bed, his injuries also were not noticeable.
The parties are in agreement that the officers did not personally
check the cells during the relevant time.  The evidence unequivo-

23

cally shows that the first time any of the officers observed Gaul's injuries was at the time he was released on bond.  At this time, the officer promptly called for medical help, and Gaul was treated.  Because the officers did not have knowledge of Gaul's injuries and acted immediately upon observing his injuries, the record is clear that they did not act with deliberate indifference and violate Gaul's right to medical attention.

Gaul has raised a series of other claims, including failure to train and supervise, false arrest and unlawful detention, false imprisonment, and failure to evaluate.  Gaul has conceded that summary judgment should be granted on all of these claims.

_____

Based on the foregoing, the Motion for Summary Judgment [DE 21] filed by the defendants, City of Hammond, Indiana, John Doe and Richard Roe, on August 12, 2011, is **GRANTED.**

ENTERED this 24th day of January, 2013

s/ ANDREW P. RODOVICH
United States Magistrate Judge